Good morning, Your Honors. Thank you. I'm John Payer. I'd like to reserve five minutes for rebuttal, please. And the two issues I want to concentrate on this morning are, first, did the complaint fairly raise the issue that the loan was void ab initio? And second, did the evidence support those allegations and create an issue of fact? So first, the complaint did allege a 480 violation against the original lender, and this Court's decision in Compton v. Countrywide is determinative of the issues herein. In Compton, the Court employed a detailed analysis of Chapter 480, and citing Hawaii Community Federal Credit Union v. KEKA, said there are three elements to a 480 claim. One, a violation of 480-2. Two, injury to the consumer caused by the violation. And three, resulting damage. Two of the three elements are uncontested. That is, Compton held that a borrower is a consumer, and the complaint alleged also that Cabrinha was a consumer who suffered injury. That's in Paragraph 40, 83, and 85 of the complaint, Excerpt 235-240. And second, plaintiff alleged damage, quote, in an amount to be proved at trial, end quote, in Paragraph 83 and 85, Excerpt 240. That's sufficient under Compton. She also led specific damage in that express capital charge to her yield spread premium of $10,718, and also charged an interest rate of 7.875 instead of the 1% advertised and represented. How was she misled? Well, she was misled in two ways, Judge Bybee. First, she was misled because the loan application that was filled out by the broker and approved by the original lender express capital showed a 1% interest rate. The final rate was 7.875, and the APR was 8. Counsel, here's my difficulty with that. There was a document that used the 1% rate and would support your argument in an evidentiary way, but on the date that the mortgage was signed, if I'm reading the record correctly, a correct truth in lending disclosure statement accompanied that that gave, in fact, a higher annual percentage rate, 8.071, and showed the large payments and so forth. So if a misleading document is given to her on August 1st, but she gets a correct document three days later, what are we to make of that? Can a reasonable person rely on the earlier document? That's a great question, Judge Graber, and a reasonable consumer would be misled, and the Compton case said exactly that, citing KECA. But why would a reasonable consumer be misled if after three days they get the corrected information in their hands? Because, and it was more than three days, the original loan application also showed a 1% interest rate. Is that an application with NLO or is that an application with Express? Well, it's an application that NLO created and was approved by Express. You have a truth in lending disclosure, so Judge Graber's referred us to two truth in lending disclosure statements. One was issued on August 1st, one was issued on August 4th. One shows the 1%, one shows 8%. But the first one was created by NLO. It doesn't mention Express any place on it. But we've alleged that NLO was an agent of Express Capital. Does your argument depend on being able to prove that? No, no, because... Okay, then where did Express Capital mislead the... Because they approved the application that showed a 1% loan. They gave an earlier truth in lending disclosure showing a 1% loan and the good faith estimate showed a 1% loan. So only the last one showed the 8% APR. So what happens is... Why there was a difference there? Yeah, why there was a difference is they were sucking her in. This was a bait-and-switch, and this is exactly what Compton says. The premise of your question is leading the invest. Because the 1% truth in lending statement, you keep calling it the June 1 statement. And up on the top... Forgive me, you mentioned it, August 1. And on the top of it, there's a typewritten media facts date of June 9, 2006. But the actual signature line looks like she dated it 5-1-0-6. Is this the one that you're thinking that... The 5 is sort of a blob. It's kind of hard to handwrite. It doesn't look to me like an 8. But is this document you're describing as the August document? Yeah, I think so, Judge. Is your theory that she had this in June and signed it August 1? If you look at the complaint, they sent out an advertisement back in the beginning saying 1%. They then did the loan application showing 1%. They then had the good-faith estimate showing 1%. And then at the last minute, they switched to 8%. This is typical of... Go ahead. Well, when you say at the last minute, that's what I'm trying to get at. A minute ago, Judge Baker was describing these documents. I think it's consistent with you as being signed three days apart. I'm not sure they weren't signed months apart. Maybe it doesn't matter, but that's what I'm trying to get at. Well, I think you're right. It does matter if it was earlier. To be honest, I'm not positive either. But there were representations made all along the way that it was a 1% loan.  Again, before you go to Compton. Okay. I'm not sure, frankly, when she received that particular document. I don't know. She had died before the complaint was filed. But it was advertised from day one that this was a 1% loan. And all of the documents until the last one said that. And Compton, citing KECA, says that a simple allegation that the rate was misrepresented during the loan negotiations is sufficient to state a 482 claim. And that's exactly what we have here, whatever dates you use. Oh, sorry. You keep referring to they. And I'm not sure who they is. If they is Enloe, as it is in some documents, or they is RESS, which is in other documents. Now, I asked you whether you told me that they were imprimity or that they were connected, that one was the agent for the other. I asked you if your argument depended on that, and you told me no. But you keep using the word they, so now I don't know who you're talking about. Well, I'd say the argument is helped by that, but it doesn't depend on that. The complaint. They have to be very precise in telling you who misrepresented what. Well, they both did. Well, okay. But these documents aren't issued by them jointly. They're issued by one party or the other. So if your argument doesn't depend on you showing an agency relationship, then you have to be very precise in telling me who misrepresented what and when. The complaint says, quote, the yield spread premium was compensation for arranging a higher interest rate than Cabrinha could otherwise have qualified for, thus benefiting both the lender and mortgage broker to the detriment of Cabrinha. It also says, quote, the terms of the loan, the misrepresentation of plaintiff's income, the failure to give plaintiff documents, and the excessive charges, including the yield spread premium rendered the loan null and void ab initio under Chapter 480. And that's in Paragraph 83. The former quote was Paragraphs 38 and 39. It's just... You have Enloe in front of us now. They've been settled out. Is that right? Right. Tell me where Express Capital misled Ms. Cabrinha. They approved... They approved the... First of all, we did allege that they were an agent. And Charles Wheeler... Let the agent decide for one. Okay. Yes, Judge. Your argument doesn't depend on that. It helps, but I don't think it depends on that. No. They approved the loan application. They approved the good faith estimate. They had all this in front of them. It's not like they're blind. This is the kind of thing that led to the financial crisis in 2008. Express Capital. Yes, they had everything. And you can see that from Charles Wheeler's declaration. Yes. Yes, that plus all of the other... Again, Compton says if you misrepresent the rate in a loan negotiation, that's a 480 violation. They did that not only... Yes, you're right. They did that with the truth in lending statements. They did that with the good faith estimate. They did that with both loan applications. And they did that with the initial advertisement. I guess I'm having trouble seeing where Express Capital itself did those things. Well, if you read... So can you give me a page number to the citation to the record where it did something wrong? Charles Wheeler says that the evidence that the broker and lender were agents and joint venturers in that they charged exorbitant fees at the expense of Mrs. Cabrinha. That's your agency argument. Right. I keep asking you this question and I keep getting different answers, so... Well, I'm saying that is an important argument. It's not the only argument as well. I'm asking whether your argument depends on it or not. If it doesn't depend on that, then I hope you'll answer Judge Graeber's question, which is where are the documents in which Express misrepresented the loan? I think that the joint venture argument is an important argument and does cover that. Separately, I think even without that, there are documents in there because all of those documents... What page where Express says something wrong? Because at page 158, they give correct information on the truth in lending disclosure. Express does, and that's the same date the mortgage was signed. So it would help me if you gave us a page or pages where other representations were made by Express, if there were any. Excerpt 117 in Mr. Wheeler's declaration and excerpt 103-4 in Ms. Saliga's declaration. I also... I'm running out of time, but... Wheeler's declaration is not evidence in and of itself of what Express did. It's an analysis of it. Well, it's an analysis and it says... Can you give us a document that Express issued to her that misrepresents the loan? The documents are that they approved the loan application, two loan applications showing 1%, that the first truth in lending disclosure, which they knew of and had, they had all of these documents in their file. They can see. They're underwriters. They're all issued by Enloe. Well, I understand that, but they're issued by Enloe, but they're in the loan file. But Enloe is not the lender. But they're in the loan file, and the lender is responsible for reviewing the documents in its own file. This is how... But isn't it also responsible for correcting any misimpressions, and isn't that what it tried to do with the corrected truth in lending document? They corrected that at the very last minute when she's signing. You know how these work. You get 200 pages of documents, sign here, sign here, sign here, sign here. They've told her 1% all this time, and then she's signing. Can you just give me one document prior to the truth in lending disclosure statement signed on August 4th in which Express Capital has told her that they're going to approve a loan of 1%? They have approved the documents that were in their... Well, page 82 is where the uniform residential loan application starts, and it does say, I think it says 1% on there. I may be wrong about that. It does. Excerpt 134. But this is issued by Enloe. Excerpt 134, the good faith estimate. Yes, it's issued by Enloe, but it's in their file. And I want to get quickly to the, before I run out of time, to the yield spread premium argument, because that was a charge charged by the lender. It was a kickback to the broker for arranging a rate higher than she should have received in the first place. So she paid $10,700 to get a higher rate than she should have otherwise qualified for. And that's also specifically alleged in our complaint, and that's also a 480 violation. Compton is very clear that any kind of negotiation up to the loan that misrepresents the interest rate is a violation. The yield spread premium is just a horrible thing. They charge you $10,700 to get a higher rate than you should qualify for, and the lender and the broker split that fee. It's a kickback, as shown clearly by Mr. Wheeler. So these claims were alleged and proved, and there is clearly a 480 violation, clearly a question of fact as to whether there's a 480 violation. And, Judge Bybee, to the extent that agency is necessary, it was alleged and it was proved. And Mr. Wheeler has shown that. What's your best evidence for agency? Just the fact that there was a premium? There was a kick. Enloe got $24,000, almost 4% of the loan, for doing almost nothing. And most of that was a kickback for arranging a higher rate than she would have gotten. Is there any discussion between Ms. Cabrera and Enloe that Enloe would underwrite this loan? Did you ever get the impression that Enloe itself was going to underwrite the loan? Not that I'm aware of. Not that I don't know, but I'm not aware of that. We've used a lot of your time with questions, so we'll give you three minutes for rebuttal. Thank you so much. We'll hear from Ms. Tanaka. Good morning, Your Honors. If I may just very briefly address the cases that counsel had brought to the panel's attention in January, if I might just briefly touch on those three cases. The first one is he cites Schmidt for the proposition that the discovery rule, not the transaction rule, is a standard in Hawaii for determining when the statute of limitation runs on a claim. And I wanted to point out to the Court that Schmidt is not a UDAP case. It's a Fraudulent Transfer Act case. And it does not – in that case, the Court did say that the limitation period begins on the date that the claim discovers that the transfer was fraudulent. So that's what Schmidt stands for. But it doesn't alter the standard in Hawaii for determining when the statute of limitations begins to run for a UDAP claim. I'm not sure why that matters. Because if the mortgage contract was void at the time it was entered into, then selling that to another party doesn't revive the validity of the contract, at least as I understand Hawaii law. I understand it, Your Honor. And there's a statute, HRS 480-24. It clearly states that any action to enforce the cause of action arising under this chapter, which includes the 480-12 claim, shall be barred unless commenced within four years after the cause of action accrues. And under Hawaii law, the four years is from the date of the occurrence of the violation, not the discovery of the violation. And we have case law that says, here in this case, since plaintiff is alleging that the violation stems from the loan origination process, then the violation must have occurred at least by the time she signed the mortgage document, which was August 4, 2006, because that's the date that she became contractually bound to the terms of the loan that she's now claiming was obtained by unfair and deceptive means. So the trigger date is the date of the loan, August 4, 2006. In this case, she did not file her complaint until May 18, 2011. And that's five years later. So if nothing else, her Chapter 480 claim is time-barred. I want to touch briefly on Compton because that certainly is a case that plaintiff seems to be relying heavily on. I just want to point out that Compton is not on all fours. It is procedurally and factually distinct from our case. Compton involved a motion to dismiss. And in that case, the court said that plaintiff had nudged her UDAP claim across the line from conceivable to plausible. What we have here is a summary judgment motion, not a motion to dismiss. And here the plaintiff has to do more, much more, than just simply nudge her claim across the line. And she did not do that. Now, the last case that plaintiff cites, the supplemental case, is Johnson. That's a due process violation case. And there the court did say that the complaint should not be dismissed for an imperfect statement of their legal theory. However, the court did say in Johnson that you need to plead facts sufficient so that plaintiff's claims are at least, as they called it, substantive plausibility. And in this case, as the trial court found, the plaintiff's complaint lacked the factual underpinnings to maintain a 480-12 claim against the bank defendants. The declaration of Ms. Saliga, which is ‑‑ I'm using the numbers that are on the bottom of the submission. The record is 0104, paragraph 18. Ms. Saliga clearly states that it was Andrew Shirley, one of the defendants that had been settled with, that filled out the loan application. So the bank certainly had nothing to do with the loan application process. And the only allegation that's in the complaint ‑‑ At what point did Ms. Cabrera realize that it was going to be, what is it, Enterprise? Express, I'm sorry, was going to be the lender rather than Enlo. Did she have the impression that Enlo was going to be the lender here? You know, I don't know. But based on her declaration, I'm assuming so because all of it, the complaint and her declaration, is filled with statements about how they basically ‑‑ Enlo Enterprises and Parker, you know, sucked her into this. And in fact, after the loan, caused her to invest the funds into a scam investment. Can you explain the discrepancies between the two truth and lending disclosure statements that we have in the record? I really can't, Your Honor, because, of course, my client is not the original lender, so I have no idea why there is a discrepancy. It seems very unusual that there are two of them, and particularly unusual that they're signed on different dates. Is there anything in the record that explains that? I don't believe there is anything in the record that explains it, other than it has been corrected. She did get the truth in lending statement to the extent that there was a problem with a TILA claim. That's time barred as well. It's anywhere from one to three years. That has come and gone. But the point is that she was aware of it at the time, and quite frankly, she paid the mortgage. Is the truth in lending disclosure statement, is that something that's typically issued on the day that you sign all the rest of the documents? Is that something you get in advance? I'm not sure, but I would assume it is. She signs all the loan documents on August 4th, is that correct? I don't know when she signed the documents. I really have no idea. I believe the Enloe defendants were with her or at least somehow connected with the signing. I'm not sure. I do know that the loan date is August 6th, so my guess would be that it was signed somewhere around that period of time. So if she doesn't receive a correct truth in lending disclosure until the date of the loan, does it fulfill its purpose of giving notice and time to think about it? I believe it does, Your Honor. There's a time period after she receives it in which she could have said, wait a minute, you know, that's not what I understood. That's not what I agreed. I don't want to do the loan. There is that time period that she could have done that, and she didn't do it. So even though here's a statute of limitations question about Hawaiian law, the statute of limitations prevents a suit from being brought more than four years after the offense has occurred. But what happens when it is pleaded as a defense? Let's say the other contracting party comes in to get money on a contract that was void initially. Can that be raised as a defense that the contract was void, even if the time otherwise has expired? Do you understand my question? It is a question that can a subsequent investor of the loan? No, it's a generic question about Hawaiian law and about the statute of limitations. I can't come in and say ten years after the fact I want to stop paying on something because ten years ago I was deceived into signing it. But what about the reverse situation? Ten years later, the other contracting party sues me. Can I raise as a defense that I've been paying on a void contract all this time, and no, you can't get any more out of me? I don't believe you can, Your Honor. What case says that? Well, I don't know that that precise fact pattern has presented itself to the court, but there are cases that talk about specifically 480-12 claims and how it is. But this is a defense in my hypothetical. Right. And I'm not aware of it being used as a defense. I can cite you to Rays v. R.E.Y.E.S. v. H.S.B.C. Bank. I only have the Westlaw site. It's 2015 Westlaw 3476371. And, well, I leave it at that. And what is that case? Rays v. H.S.B.C. Bank, USA. Yes, and you're citing it because? Oh, I'm sorry. That's the case that talks about when the statute of limitation begins to run on a 480-12 claim. But, see, that's not relevant to my question. I'm looking at 480-12, which says that any, I'm going to skip some words, but it says any contract in violation of this chapter is void and is not enforceable. So just that wording suggests to me that defensively it might be usable forever as distinct. So if you're the other side of a void contract, you can't enforce it. So anyway, if there are no cases, there are no cases. Well, I'm not aware of it. I do believe that Chapter 480-24 is very clear about the enforcement side of it. Well, it's clear about the plaintiff's side, but it's not clear about the defensive use. Well, I would imagine that it should apply for the defense as well, use of it, because otherwise it would sort of erode the point of the statute, which is to cut the claims off after a certain period of time. And if you can't enforce it because they can say statute doesn't apply to me because I'm using it as a defense, then how does that work? It makes no sense to me. But I'm not aware of any particular cases. Well, it makes sense to me, I guess maybe in this sense, that a party can voluntarily agree to continue on the course of a contract that could have been void, but then change their mind. And I guess you're saying that this limitation covers it all because of the need to, you know, not have stale claims or whatever. But it could make sense either way, it seems to me. And again, Your Honor, I'm sorry, I'm not aware of any cases on the defense side, so I just don't know. If I may touch just briefly, Your Honor, on the motion to deny plaintiff's motion to amend, just very briefly. It's true that the parties were engaged in the settlement discussion, but as we all know, as litigators, you know, settlements are never certain. You never know if you're actually going to settle or not. And meanwhile, the pretrial deadlines start to march on, and I think it would have been prudent for the parties. Parties still have to comply with the court's order, even if you're engaging in settlement negotiations. And if you're looking down the road and see these deadlines coming up, appropriate motions could have been filed to move the deadlines off, in light of the fact that the parties were engaged in settlement negotiations. And here, none of that occurred. Both the magistrate and the trial court found that there was no good cause to alter or amend the Scheduling Rule 16 Scheduling Conference Order. We listed in our brief at pages 24 and 25 all the ways and reasons why we felt that plaintiff was not acting, was dilatory in seeking the amendment, and I won't repeat it here. But the point, Your Honor, is that the plaintiff has managed to not make mortgage payments for over seven years. And at this point, we are asking that the court affirm the trial court's rulings so that the banks can finally get paid. Do you have any further questions? I'm happy to answer them. I don't believe that we do. Thank you. Thank you. Mr. Fair, you have three minutes. Thank you. First, the yield spread premium that we discussed before was not disclosed in the Truth in Lending Statement or anywhere else until the HUD-1 came out. And, again, you can see this from Charles Wheeler's declaration, which should be looked at very closely. The HUD-1 came out after the loan had closed, and that's when monies are dispersed, and that's the first time the yield spread premium was shown to anybody. So clearly that – Did she not know what payment she would have to make? Did she know what – That's money up front, right? This is money that's coming out of the – Yes. The yield spread premium is charged to her, and, again, was the kickback to the broker. But it wasn't disclosed anywhere until the HUD-1, after the loan was already finished. So she'd signed, and money was dispersed, and then it showed up. Secondly, if the paragraphs 38, 39, 83, and 85 of the complaint set forth the 480 claim, including the yield spread premium and excessive charges and so on, and so the complaint clearly set forth a Chapter 480 claim, and the evidence showed – Charlie Wheeler's affidavit declaration showed that those items were correct. What is your response to the statute of limitations? Okay. I'm glad you asked. First, it wasn't raised or ruled on by the trial court. It wasn't raised or it wasn't ruled on? Neither. I don't believe it was argued in the trial court, and it wasn't ruled on. Was it in the pleadings, or was it in the summary judgment papers? It might have been in the pleadings. I don't think it was in the summary judgment motion. I don't believe. And more importantly, to your point, Judge Graber, that in KEDA, Beneficial Hawaii v. KEDA, the court said, and I quote, void means an instrument or transaction that is wholly ineffective, inoperative, and incapable of ratification, and which thus has no force or effect, so that nothing can cure it. And the court went on to say it's unenforceable at law and in equity. So if nothing can cure it, the mere passage of time can't cure it either. No, but there is a statute of limitations, and you are the one who filed the complaint. So presumably, as the plaintiff, you would have to meet the statute of limitations. The statute of limitations talks about an affirmative claim under 480.13. This is a claim that the loan was void ab initio, and as the Hawaii Supreme Court said, nothing can cure it. And in the Schmidt case, it's quite clear now, which, yes, it wasn't a 480 case, but it's similar. It's under the UFTA, and the discovery rule, not the occurrence rule, is the law in Hawaii anyway. And the court basically held that it doesn't make any sense to hold that somebody who didn't know of something had to raise it before they found out about it. And in answer to your question about whether it can... What is the triggering event for the statute of limitations? When somebody would reasonably know what the violation... She would not reasonably know until she saw an attorney. Oh, no, but there are no cases that talk about that. Are there in Hawaii, as opposed to being on notice of the facts that would cause a reasonable person to know? I mean, she had something in hand that said 1%, and suddenly she's faced with something that says 8%, and why isn't that sufficient to put a reasonable person on notice that there's a problem right then? That wouldn't... Even if that's correct, that wouldn't apply to the yield spread premium, because... Well, when was that? When was that? Had one... One was issued shortly after. So still more than four years before the filing of the complaint? Yes, absolutely. Okay. But nobody would know... No reasonable consumer would know what a yield spread premium is. But they know the difference between 1% and 8%. Yes, but they don't know what the yield spread premium is. That's separate. She didn't know how much her monthly payments were going to be. Oh, yes. That's true. They were going to go up. Well, they... Well... Okay. They told her they were going to go up, and they told her they were going to go up dramatically. Well, at that point, after she had been deceived, yes, yes. So why isn't that the moment that she should have known that something was badly amiss? She should have known... She might have... You might be able to say she should have known something was amiss with part of the loan. She would have no idea what the yield spread premium was, nor that it was a kickback to the brokers. Nobody would know that. No consumer would know that. That's a fairly esoteric charge, and it was hidden. And there are cases that talk about that in Hawaii. The Schmidt case does talk about why the discovery rule and not the occurrence rule applies, and it goes into that. There's also Kalanui v. Hawaii Community Federal Credit Union. I don't have the site here, but it's K-A-U-A-N-O-E, and it's a truth in lending case. And the Hawaii courts said that you can raise that as a defense in response to a claim, even though the one-year statute of limitation has passed. And they did talk about the reason being that you don't necessarily know that you have a problem. Thank you, counsel. We appreciate very much the arguments from both of you in this interesting and challenging case, and the case is submitted. That is our only argued case for this morning's docket, so we will be adjourned. Thank you very much.
judges: Graber, Bybee, Christen